UNITED STATES of America for the use and benefit of CALDWELL FOUNDRY AND MACHINE COMPANY, Inc., Appellant

v.

TEXAS CONSTRUCTION COMPANY and United States Fidelity and Guaranty Company, Appellees.

No. 15166.

United States Court of Appeals Fifth Circuit.

June 30, 1955.

Rehearing Denied Aug. 16, 1955.

Leake, Henry, Golden & Burrow, Dallas, Tex., Smyer, Smyer, White & Reid, Birmingham, Ala., Hawkins Golden, Wm. Burrow, Dallas, Tex., W. Brüce White, Birmingham, Ala., for appellant.

Donald G. Gay, Dallas, Tex., for appellee.

Before HOLMES and RIVES, Circuit Judges, and THOMAS, District Judge.

RIVES, Circuit Judge.

Appellant, Caldwell, sued appellee, Texas, and its surety, United States Fidelity and Guaranty Company, under the Miller Act, 40 U.S.C.A., §§ 270a–270d, for the unpaid balance of the purchase price of certain hoisting machinery installed on the spillway of the Lavon Dam on the Trinity River some 30 miles northeast of Dallas, a total of $33,309.61 plus interest and attorney's fees. The claim was not seriously contested except by way of counterclaim for damages resulting from delay in completing and delivering the machinery. At the conclusion of the evidence, the district court announced orally very meager findings of fact and con-

clusions of law [1] to the effect that Caldwell and Texas were entitled to equal recoveries from each other, and accordingly entered judgment denying relief to either party.

Texas' contract with the Government for the construction of the spillway provided that it was to commence work February 3, 1950, and complete the construction by September 20, 1952, under penalty of $200.00 per day in liquidated damages. The Korean War, however, intervened on June 25, 1950, and thereafter strict priorities on the use of critical material were imposed. Under date of February 7, 1952, the United States District Engineer wrote Texas that:

"* * * it has been determined that delay in the performance of said contract was due to causes beyond your control and without your fault or negligence, namely delay in delivery of critical material.

"Therefore, the time for completion of performance under said contract is hereby extended to the 26th day of February, 1953."

Texas actually completed the work on December 18, 1952, well within the extended time limit.

The contract between Texas and Caldwell is evidenced by a purchase order dated February 2, 1950 for furnishing

1. "The Court:

"This action was instituted on August 29, 1953, various ancillary and preliminary motions and matters were passed upon and a counter claim was filed by the defendant, and, now we have a case in practically two days—not quite two days —counting long-hours that were spent on yesterday, in taking testimony.

"I find as facts, Gentlemen, that both parties engaged in what they thought, in good conscience, was the right thing to engage in, to-wit, drawings, and, estimates, and, changes, and things of that sort which of themselves occasioned much delay in getting out the special sort of machinery that was to be used in the construction job and the impediments, not only for the contract, but of the work.

"That these excuses, and this sort of delays, were engaged in by both sides, as I said, in good faith, but resulting in delays. They would want a certain thing drawn. They would have to wait on the government engineers. They would have to wait on somebody to approve that. Then one would approve it, and then the other would approve it, and then they would have to change it until it was—as one looks in retrospect—one is astonished at the time that was taken to get his improvement started and to get it finished.

"The defendant, The Texas Construction Company, made a contract with the plaintiff, the Caldwell Company, to furnish the machinery. The Caldwell Company didn't furnish the machinery, it didn't make it, it was to make it, it waited for a long time, and, finally placed some orders up in the northeastern part of the United States, some of them Wisconsin, that resulted in the consumption

of time, which time, as I said, finally pushed its way into the priority decade.

"The recovery of any rights, or any amounts here by the defendant, as a righteous recovery, because of the plaintiff's delay in making this machinery, which it was bounden to make under its contract, or in placing its orders, which it was bounden to place at a proper, early time, is all justice. I don't think either party should recover anything, neither one of them. The damages that have been suffered and proved by the defendant, by reason of the failure of the plaintiff to furnish the hoisting machinery for the gates, it certainly is entitled to have charged against the plaintiff, I find that those two amounts about equal one another.

"I further find that the purchase price for the machinery to be made and furnished by the plaintiff was approximately $100,000. That it has been paid approximately $70,000. That the damages suffered by the defendant by reason of the failure of plaintiff to furnish that machinery, is approximately thirty odd thousand dollars. So that, as I have already found, offsetting those claims against one another, there is nothing for which this Court should render a judgment in favor of either party.

"I further find that there is a diversity of citizenship, that a jurisdictional amount is involved, and that the improvement was the Lavon Dam, a short distance from the City of Dallas, in the State of Texas. That the dam was for the purpose of impounding surface water.

"As a conclusion of law, I hold that neither shall recover anything here, and, that the costs shall be divided equally between the two.

and delivering all of the tainter gate [2] operating machinery and hoist chains required for operating the 11 double and 2 single tainter gate hoists. Some pertinent provisions of the contract are quoted in the margin.[3] As to the time of delivery, the contract provided: "Delivery shall be made in accordance with the contractor's requirements based on the predetermined schedule for progress and completion of the basic contract with delivery to be completed in approximately one (1) year from date of this purchase order." The word "approximately" was inserted at the insistence of Caldwell. No provision was made in the contract between Texas and Caldwell for any liquidated damages for delay. Caldwell completed delivery of the final hoists during the week of August 17, 1952, more than two and one-half years, instead of "in approximately one (1) year", after the date of the purchase order. While this delay occasioned Texas no liquidated damages to the Government, Texas claims that it did cause increased overhead and salaries, additional labor costs, insurance premiums, rental of machinery and loss of interest on the part of the contract money retained until the work was completed, for all of which Texas filed a counterclaim for $39,583.78, somewhat more than the unpaid balance on the purchase order, $33,309.61, and which, as has been stated, was allowed by the district court in the amount of such unpaid balance.

The parties differ decidedly as to what was meant in the time provision of the contract heretofore quoted by the expressions "predetermined schedule for progress" and "approximately", but we do not find it necessary to decide such differences. Nor is it necessary for us to decide Caldwell's contention that the remedy of Texas, as the prime contractor, for excusable delay, was provided in its contract with the Government, and that in accepting the engineer's finding, heretofore quoted, that delay in the performance of the contract was due to delay in delivery of critical material, Texas was thereby estopped to deny that delays on the part of Caldwell were excusable. For, while the meager findings of the district court have furnished us little or no help, we have carefully studied the record and the original exhibits in connection with the briefs and arguments, and we are left under the firm conviction that Caldwell's delay in performance of its contract was excusable and justified by the priority laws and the delays of the Government Engineers in the approval of plans and material.

The preparation by Caldwell of the shop drawings involved a major change in plans of the heavy machinery by substituting a herringbone gear for a worm gear to effect a saving of some $16,000.00, passed on to Texas. For Caldwell's shop drawings to be completed it was necessary for Texas to furnish the anchorage plans which were forwarded under date of July 14, 1950. The shop plans were then completed and submitted for approval in the latter part of the same month. Caldwell received notice on August 9, 1950, of the approval by the Government Engineers of these plans.

"I will ask you to prepare a judgment in accordance with the findings."

2. A "tainter" gate is a large curved steel gate used for controlling the height of the impounded water.

3. "The operating machinery units and appurtenant components shall be constructed of materials of the kind and quality designated on the plans and/or specified in the appropriate specifications for the Construction of the Spillway, Lavon Dam and Reservoir prepared by the Corps of Engineers, U. S. Army, Galveston District, Galveston, Texas.

"The supplier shall prepare detailed shop drawings showing a working layout of the entire assembly, the various units and parts of standard manufacture which he proposes to use, and the fabrication of all parts of special design. These drawings together with the itemized lists of all units and parts, giving the manufacturer's name and identifying symbols and the type, grade and class of the materials to be used shall be submitted for formal approval by the District Engineer."

On that same day, Caldwell ordered the motors and electrical equipment from the Louis Allis Company of Milwaukee, Wisconsin.

By January or February, 1951, within the year, Caldwell had everything ready except the electrical equipment. The items which delayed performance were the electrical equipment, and the last items delivered were the small torque motors for the brakes. Those items had been necessarily sub-contracted by Caldwell, Louis Allis Company in turn necessarily selected Cutler-Hammer, Inc. to produce the control equipment, including the brakes and limit switches, because the evidence shows that Cutler-Hammer was the only company that made such equipment. Further the brakes, the torque motors of which were the last things delivered, were specified in the contract drawings as follows: "Cutler-Hammer type TM 10 dia. wheel, or approval equal." Cutler-Hammer ordered the torque motors for the brakes from Electric Specialties Company. Mr. Peterson of Cutler-Hammer testified, "For the past 15 years we have tried to find another supplier of these special torque motors without success."

Mr. Skidmore for Louis Allis Company, Mr. Peterson for Cutler-Hammer, Inc., and Mr. Masone for Electric Specialties Company, each testified in effect that the delay was due to contradictory or imperfect specifications and the priority system, and that his company could not have performed sooner and complied with the law. There is no testimony to the contrary.

■ The Texas courts are in accord with the law generally prevailing elsewhere " * * * that, where the performance becomes impossible by a change in the law, the promisor is discharged." Houston Ice & Brewing Co. v. Keenan, 99 Tex. 79, 88 S.W. 197, 198; Moller v. Herring, 5 Cir., 255 F. 670, 3 A.L.R. 624; Restatement of Contracts, Sec. 458; 6 Corbin on Contracts, pp. 336, 364. A case very closely in point on its facts is United States, for Use of Gillioz v. John Kerns Const. Co., 8 Cir., 140 F.2d 792, 152 A.L.R. 1340.

In this connection, appellant Caldwell relies upon the following provision of the Defense Production Act of 1950:

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from *his* compliance with a rule, regulation, or order issued pursuant to this Act (sections 2061–2166 of this Appendix), notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. * * * Sept. 8, 1950, c. 932, Title VII, § 707, 64 Stat. 818." 50 U.S.C.A.Appendix, § 2157. (Emphasis supplied.)

To such reliance, appellee Texas counters by calling attention that the delays were not due to the work done in Caldwell's own plant, and argues as follows:

"Appellant * * * ignores the significance of the word 'his'. When the wording is analyzed it is evident that the protection of the act is afforded for 'compliance' with a rule, regulation or order issued pursuant to the act. Whose compliance with the act? Clearly the answer is that the pronoun 'his' refers back to the word 'person,' meaning the person seeking to escape damages. Thus, it is the person relying on this provision to escape damages who must rely on 'his' compliance with a rule, regulation or order—not on the compliance of some other person. Any other construction would render the word 'his' meaningless and, in effect, substitute for the pronoun 'his,' the word 'anyone's' compliance. True, the person claiming protection of the statute can show that the damages resulted either 'directly or indirectly' from the compliance, but this does not affect his burden to show that it was 'his' compliance which resulted in the damages."

The Act was amended June 30, 1952, and the word "his" omitted. See Pocket Supplement, 50 U.S.C.A.Appendix, § 2157. Further, that word was omitted from all regulations of the National Production Authority beginning with and

subsequent to Regulation 2, October 3, 1950, Section 11.22.

In any event, it seems to us that the only necessity for 50 U.S.C.A.Appendix, § 2157 in the first place was the possibility envisioned in the clause, " * * notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." In other respects the statute is simply declaratory of the common law, heretofore sufficiently stated for the purposes of this case.

■ The Government, for which the work was to be done, prevented timely performance by its priority laws and regulations and by the delays of its engineers in the approval of plans and material. Justly, it absolved its prime contractor, Texas, from responsibility for such delays. It is not just nor right now to permit Texas to charge its sub-contractor, Caldwell, with damages that were caused by the Government. Accordingly, the judgment is reversed and the cause remanded with directions to enter judgment for the appellant, plaintiff below. See 28 U.S.C.A. § 2106.

Reversed and remanded with directions.